# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### July 17, 2012 Session

## MARTHA ANN FREEMAN v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2044    J. Randall Wyatt, Jr., Judge**

---

**No. M2011-01617-CCA-R3-PC - Filed March 31, 2014**

---

The Petitioner, Martha Ann Freeman, appeals from the Davidson County Criminal Court's denial of her petition for post-conviction relief from her conviction for first degree murder, for which she is serving a life sentence. She contends that trial counsel provided the ineffective assistance of counsel in the plea bargaining process. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Jodie Ann Bell, Nashville, Tennessee, for the Petitioner, Martha Ann Freeman.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and Katrin Novak Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner and Rafael Dejesus Rocha-Perez were convicted of the first degree murder of her husband, Jeffrey Freeman. This court summarized the facts of the case in the appeal of the Petitioner's conviction:

> [T]he Defendants began a relationship in 2004. This relationship continued throughout the fall and winter of 2004 after Freeman moved out of the marital home and into an extended stay hotel in Brentwood, where she stayed with Rocha-Perez. On December 29, 2004, the victim spoke with a divorce attorney about his legal rights, but it is unclear if Freeman ever knew about

this. Sometime in December 2004, Freeman's friend, Tony Cantrell, moved Rocha-Perez out of the extended stay hotel and into an apartment in Murfreesboro. Cantrell concluded that the relationship between the two had ended. Sometime thereafter, Freeman returned to the marital home. Rocha-Perez and Freeman restarted the relationship, and Rocha-Perez moved into the Freeman house without the victim's knowledge. Rocha-Perez had the "run of the house" while the victim worked long hours at the Freemans' business.

Tony Cantrell began work outside the Freemans' home on the Thursday, April 7. He did not finish because of rain, and he advised the Freemans that he planned to return Monday, April 11, after work, to finish. On Sunday, April 10, at 10:00 p.m., Freeman picked up a prescription for hydrocodone, a pain killer with a side effect of drowsiness. One hour later, at 11:00 p.m., Freeman called the victim's mother to explain to her that the victim would not be calling that night because he was "ill." At 7:45 a.m. on April 11, a neighbor saw Freeman standing on her front porch with a cigarette in hand. Freeman appeared "very still" and "rather unusual." A short time later, at 8:00 or 8:30 a.m., Freeman called Resi-fax to report that the victim would not be at work that day.

At 3:45 p.m., Rocha-Perez was seen running through the neighborhood and into a house under construction. At 4:00 p.m. on April 11, Freeman went to her neighbor's house, and the neighbor called 911. Immediately after she pounded on Beverly's door, Freeman appeared to be "in shock," "panicky," and "anxious." A short time later, however, Freeman was much calmer, and Beverly recalled that she never cried. The first emergency responders arrived at the scene and described Freeman as "excited," "agitated," "crying," "flailing about with her hands and that sort of thing," and "hysterical." When questioned, Freeman indicated that the incident only occurred twenty to thirty minutes before the emergency responders arrived.

The police, firefighters, and medical personnel discovered the victim's body in the master bathroom. The victim was wet, inside of a sleeping bag, and on his stomach. Medical testimony explained that certain marks on the victim's body indicated that he had been there for some time, at least over eight hours. There were additional marks on the victim's wrists that would have been made while he was still alive and able to struggle against the restraints. There was evidence of four to seven blows to the victim's head. The victim was ultimately killed by strangulation, which would have required

"several minutes" of pressure. Virtually no blood was found at the scene except for that under the bag around the victim's head.

The police found evidence of a clean-up also in the house. A number of trash bags were discovered containing a wet pillow case, a wet bath mat, latex gloves, and a phone cord. Additionally, a beach towel was discovered spread out in the living room floor, which contained Rocha-Perez's sperm and Freeman's DNA. There was no evidence of a forced entry to the home.

At 6:30 p.m. on April 11, the police discovered, upon information from witnesses, Rocha-Perez in the attic of a house under construction two streets from the Freemans' home. The officers arrested Rocha-Perez and took him to the police station where they questioned him. Later, in two separate business documents, Freeman signed that the victim died on April 10, 2005.

*State v. Martha Ann Freeman and Rafael Dejesus Rocha-Perez*, No. M2006-02751-CCA-R3-CD (Tenn. Crim. App. Mar. 28, 2008), *perm. app. denied* (Tenn. Oct. 27, 2008).

The Petitioner filed her post-conviction petition alleging the ineffective assistance of counsel relative to the plea bargaining process. The petition also alleged the ineffective assistance of counsel in failing to conduct a mental health and addiction investigation and in failing to consult with appropriate experts regarding evidence that might have been presented to explain the Petitioner's actions relative to the crime, but she has not pursued this issue on appeal.

At the post-conviction hearing, trial counsel testified that he was aware during his representation of the Petitioner that she had a history of mental health issues and narcotics use. He said she was "an up and down type of emotional person." He said that the Petitioner had emotional problems after she was indicted and that she collapsed in the courtroom hallway after a hearing and had to be removed on a gurney. He said the hearing had been emotional and included playing the 9-1-1 recording. He said that on another occasion, the Petitioner went to Vanderbilt Hospital for physical and mental issues. He said that the Petitioner was depressed and overwhelmed and that she did not have a support group locally. He said she did not have family members present for the hearings and did not think she had any family members at the trial. He said she sometimes called him in the middle of the night.

Trial counsel testified that he asked co-counsel to assist him and that the Petitioner agreed to co-counsel's involvement. He said he thought the Petitioner's case should be settled through a plea agreement and tried to obtain an agreement. He thought a jury would be angry with the Petitioner due to her lifestyle choices, which might affect the verdict. He

said that he told the prosecutor on several occasions that the Petitioner would plead guilty and testify for the State but that no plea offer was made before the trial.

Trial counsel testified that after the State rested its case-in-chief during the trial, the prosecutor made an offer for the Petitioner to plead guilty to facilitation of first degree murder with a sentence of twenty years at thirty percent release eligibility, provided she testified for the State. He said that he was pleased at the prospect of settling the case and that the Petitioner agreed to accept the offer. He said he and the prosecutor met with the trial court to ensure that the plea was acceptable to the court and that the court would allow the Petitioner thirty days before reporting to serve her sentence. He did not recall if the delayed reporting date issue was addressed in a second conversation with the court. He said that to the best of his recollection, the plea agreement was reached when co-counsel was not present, that the assistant district attorneys general talked to the Petitioner about her testimony, that co-counsel returned, and that co-counsel told the Petitioner he would not allow his daughter to plead guilty in the Petitioner's case. He said co-counsel also stated that Davidson County juries did not convict or rarely convicted women of first degree murder. He said co-counsel was firm and somewhat animated. He said that the Petitioner asked him what she should do but that he thought it was unethical for him to tell her to accept the plea offer and that he told her he could not tell her what she should do. He said that the Petitioner asked to smoke a cigarette and that when she returned, she said she was not going to accept the offer. He said a third attorney involved in the case went with the Petitioner to smoke. He said they had been trying to obtain the offer for a year. He said that all this occurred during a lunch break, that no more than forty-five minutes elapsed, and that the Petitioner rejected the offer no more than fifteen minutes after co-counsel's statements. He thought that at the time co-counsel made the comments, he made some comments about the proof. He was unsure whether lesser included offenses were discussed at this point. He thought the Petitioner was reminded that she might receive a life sentence if she continued with the trial. He said the Petitioner was taking medication and receiving counseling at the time of the trial. He said that in retrospect, he wished he had asked the court for more time after the Petitioner rejected the plea offer.

On cross-examination, trial counsel testified that he met with the Petitioner's psychiatrist but did not have the Petitioner evaluated for competency to stand trial. He denied ever feeling that she could not understand the process or that she could not assist in her defense. He never noticed the Petitioner abusing alcohol or marijuana. He agreed that the Petitioner was in a stressful situation when the plea offer was made. He said she was released on bond before the trial.

An attorney who practiced with trial counsel testified that he was not yet licensed when trial counsel began representing the Petitioner. He said his duties at the time included

being a runner, drafting legal memoranda, reviewing and organizing files, and acting as a sounding board for counsel. He said co-counsel was associated to work on the Petitioner's case because a lawyer should not work alone on a first degree murder case. He said counsel and co-counsel were the two best criminal defense lawyers in Nashville.

The attorney who practiced with trial counsel testified that the attorneys knew about the Petitioner's mental health issues and that they spoke with one of her doctors. He said that the Petitioner repeatedly expressed her desire for a plea offer and that he thought a good offer would have been twenty years for second degree murder.

Regarding the plea offer, the attorney testified that he returned from lunch on the last day of the trial and learned that a plea agreement had been reached for twenty years at thirty percent for facilitation of first degree murder. He said that pursuant to the agreement, the Petitioner was to testify for the State. He said trial counsel wanted to complete the guilty plea before the Petitioner's testimony in order to prevent the State from changing its mind. It was his impression the Petitioner was going to accept the deal and recalled her questioning him about parole eligibility. He said that his recollection was that the conversation with co-counsel did not take place until after the cigarette break. He did not recall if, as they returned from the cigarette break, the Petitioner entered the room before him. He said co-counsel may have said something to the Petitioner before he entered the room.

He said that when he entered the room, he noticed a change of mood and heard co-counsel tell the Petitioner that co-counsel would not accept the offer. He recalled co-counsel stating that Davidson County juries did not like to convict women of first degree murder. He also recalled that when parole eligibility was discussed, co-counsel made a statement that the Petitioner would have other concerns such as being forced to give other inmates her commissary funds. He was unsure whether he was present for co-counsel's comment that he would not allow his daughter to accept the offer. He said co-counsel was adamant that the Petitioner should not accept the offer. He said they were pressed for time. He recalled a court officer knocking on the door and telling them it was time to return to court. He did not remember anyone telling the Petitioner after the cigarette break how much prison time she would serve if she were convicted of first degree murder. He said that the Petitioner did not have any family members to support her during the proceedings and that many of her belongings were still in the law firm's basement.

Co-counsel testified that trial counsel asked him to work with him on the Petitioner's case. He said he observed a hearing and participated in a couple of meetings but did not "sign on" as co-counsel until a week before the trial. Regarding the hearing he observed, he said the victim had a seizure afterward in the hallway and was taken away by paramedics. He agreed the victim suffered from anxiety and other mental health issues during the time

-5-

trial counsel and he represented her. He was aware she abused prescription drugs and was concerned before the trial that she might hurt herself.

Co-counsel testified that his role was to formulate a theory that would not cause the jury to find her culpable despite her actions. He was concerned about the facts of the case. He was not involved in plea negotiations but was aware that trial counsel hoped to receive a plea offer. He recalled that after the State rested its case-in-chief and court recessed for lunch, trial counsel advised the Petitioner within a minute that there was an offer for twenty years for facilitation of first degree murder if the Petitioner testified for the State. He said that the Petitioner immediately asked trial counsel what she should do and that trial counsel threw his hands in the air as if to signify, "it is your call, not mine." He said that the Petitioner asked a second time and that although he did not recall exactly what trial counsel said, it was not a clear recommendation either way.

Co-counsel testified that the Petitioner turned to him and asked his opinion. He said that he did not specifically recall saying he would not let his daughter accept the plea offer but that the statement was consistent with what he sometimes said to clients. He said he told the Petitioner she should not accept the offer. He thought they had a brief conversation about the evidence being entirely circumstantial and the standard of proof for circumstantial evidence. He did not think they discussed the lesser included offenses and penalties but said they had been discussed previously. He did not recall telling the Petitioner during the lunch break that she would serve a life sentence if convicted of first degree murder, nor did he recall anyone telling the Petitioner that there was no way to read the jurors' minds regarding whether they would convict her. He was confident he told the Petitioner that the doctor testified that the homicide could have been committed by one or two people and that the proof showed the Petitioner was at a pharmacy. Regarding the statement that juries did not like to convict women of first degree murder, he did not think he mentioned gender but was confident he said first degree murder was the most difficult conviction for the State to obtain. He said that he did not think the State had proven its case and that his opinions were strong.

Co-counsel testified that shortly after trial counsel advised the Petitioner of the offer, trial counsel had one of the prosecutors come into the room and communicate the offer to the Petitioner. He thought this was before the Petitioner asked his opinion of the offer. He said that after he expressed his opinion, he thought it was best to leave the discussion to trial counsel and the Petitioner. He said that trial counsel did not pressure the Petitioner to accept the offer. He said he still felt strongly that the Petitioner should not have been convicted of first degree murder based upon the proof.

Co-counsel testified that he did not learn until months after the trial that trial counsel and the prosecutors talked to the trial judge in chambers and that the Petitioner agreed to the

plea offer at one point. He said he was a secondary lawyer on the case, thought it would be best for him to leave, and left to attend to a jail docket. He thought the Petitioner first learned of the offer when trial counsel came into the room and communicated it and said he left afterward to attend the jail docket. He said he returned just as everyone took their seats in the courtroom. He said he first learned that the Petitioner rejected the offer when trial counsel told him they were going to closing arguments. He said that in hindsight, what he said may have been too strong but that part of his duty was to advise clients about their best alternative.

On cross-examination, co-counsel testified that he was positive about his recollection of the events as regarding the chronology, where he was, what happened, when he gave the advice, when he left, the status when he returned, and whether the Petitioner agreed to accept the plea offer before his comments. He said that if the Petitioner had already accepted the offer and talked to the prosecutor, he would not have advised her in the strong terms he used.

Co-counsel testified that he was agitated that trial counsel brought a prosecutor into the room to talk to the Petitioner before she was prepared to speak. He said the Petitioner asked the prosecutor if she could receive a fifteen-year sentence, rather than twenty years. He said it did not help negotiations for the Petitioner to have indicated her willingness to accept a plea offer for a Class A felony and receive a fifteen-year sentence. He said the prosecutor left the room, and he left shortly thereafter without knowing whether the Petitioner would accept the offer. He said that the judge was entering when he returned to the courtroom after attending the jail docket and that the jury was being brought into the courtroom.

Co-counsel testified that months afterward, he and trial counsel discussed the case and were chagrined and disappointed. He said they thought the jurors were so outraged by the facts that they never considered their defense. He said he was not upset with trial counsel, nor did he think trial counsel was upset with him.

Co-counsel testified that the Petitioner appeared to understand the legal process and was able to aid in the defense and consult with the attorneys. He denied making inflammatory comments about the Petitioner's having to worry about being in danger of other prisoners taking her commissary money.

Co-counsel testified that he advised clients of his opinion about plea offers if he felt strongly one way or another but that he sometimes said he could not render an opinion because he did not have a strong feeling. He thought this was part of his job as a criminal defense attorney.

On redirect examination, co-counsel testified regarding the Petitioner's mental health that she had three ways to respond to the homicide: (1) turning in Mr. Rocha-Perez, (2) not turning him in and assisting him in escaping, and (3) deferring a decision about her course of action. He said they advanced the theory that she deferred making a decision until Mr. Rocha-Perez was ready to drive away with the victim's body, at which point she decided to alert the authorities.

Co-counsel testified that in his opinion, trial counsel should have told the Petitioner there was no question whether she should accept the plea offer because it was what she had wanted trial counsel to obtain for the last year. He said that after he gave his opinion, he left because he knew the Petitioner relied on trial counsel and thought they should make the decision together.

The forty-six-year-old Petitioner testified that she was serving a life sentence for the murder of her husband and that her parole eligibility date was in 2064. She said that trial counsel and co-counsel represented her before she was indicted in August 2005. She said that as a result of the stress of being indicted, she took an overdose of Xanax and was hospitalized at the Vanderbilt Psychiatric Unit. She said she had a mental health history of which her attorneys were aware. She said trial counsel visited her during her hospitalization. She said that between the return of the indictment and the trial, her mental health became "extremely pronounced." She said she took large quantities and double doses of depression and pain medications. She said she saw a couple of doctors and ordered medications online. She said that she spent a large amount of money, that her business failed, and that her house went into foreclosure. She said that she had difficulty dealing with the loss of her husband and that he had always handled their finances. She said that she did not have any family members in the area, that her lawyers were her support system, and that she became close to trial counsel and relied on him for things other than her criminal case. She said that when she was in a manic state, she called trial counsel on his cell phone at hours that were probably inappropriate.

The Petitioner testified about a second hospitalization after she had a seizure following a court hearing. She said her lawyers were present when the incident occurred. She said that during this time period, she met with trial counsel and discussed the discovery materials. She said that in light of the discovery and trial counsel's interpretation of it, she wanted a plea offer and did not want to go to trial. She described herself as an emotional wreck.

The Petitioner testified that co-counsel was presented as a well-known and well-respected former prosecutor who could provide needed assistance to the defense. She said

she was hesitant at first but warmed to the idea of involving co-counsel based upon trial counsel's statements.

The Petitioner testified that she was terrified going into the trial. There was a lot of media attention, and she did not want her personal affairs to be aired in court and wanted to settle the case. She said she suffered from insomnia as the trial date neared and had to take double and triple the prescribed doses of Ambien and Xanax in order to sleep.

Regarding the plea offer, the Petitioner testified that during a break toward the end of the trial, trial counsel came into a conference room and told her he was obligated as her attorney to advise her of an offer that had been made for twenty years at thirty percent for facilitation of first degree murder. She did not recall co-counsel being present but said the attorney who worked with trial counsel was present. She said that she was relieved and that she immediately wanted to accept the offer because it was what she wanted. She said trial counsel did not discourage her from taking the offer. She said trial counsel told her that he could not tell her what to do and indicated the trial could go either way. She said she was concerned because she had a home, pets, and things that needed to be completed before she reported to serve her sentence. She expressed her concerns to trial counsel, who communicated with one of the prosecutors. She said it was her understanding that she would have thirty days before she had to report to the Department of Correction.

The Petitioner testified that after the details were worked out, she went outside to smoke with the attorney from trial counsel's office. She said that when she returned, one or both of the prosecutors were in the conference room. She said she asked them questions because she did not understand exactly what the plea agreement entailed. She said co-counsel entered the room and was angry she was talking to them. She said that co-counsel admonished her, "You don't negotiate with them." She said he also stated that the State must have a weak case if they were coming to the Petitioner this late. She said co-counsel stated, "If you were my daughter I would tell you not to take this deal." She said he also told her that juries were reluctant to convict women of first degree murder. She stated that he made a statement about someone stealing her commissary but that she did not know what he meant. She said that the message she took from co-counsel's statements was that she would not be convicted and that his statements changed her mind about accepting the plea offer. She said that neither trial counsel nor co-counsel talked to her about the risk of allowing the case to go to a verdict or the proof presented and its impact on the case. She said she thought that she would either be found not guilty or if found guilty, that she would go home that evening and be sentenced at a later date. She said that she "[a]bsolutely" was going to accept the plea offer and go to prison and that she "[a]bsolutely" rejected it based upon co-counsel's actions. She thought that he was mad at her and that she had done something wrong. She said she had developed a relationship with trial counsel and co-counsel and relied on them for things

-9-

in addition to her criminal case. She thought co-counsel's experience as a former prosecutor gave him insight that trial counsel and she lacked. She said that she had ten to fifteen minutes until court resumed after co-counsel's statements and that had she had about an hour more to talk to her attorneys about the offer, she had no doubt she would have accepted it.

On cross-examination, the Petitioner testified that it was possible co-counsel's and her testimony were not consistent. She said two assistant district attorneys general were in the room when co-counsel entered the conference room. She said that her recollection was that when co-counsel learned she was talking to the prosecutors, the prosecutors left the room. She said trial counsel was present. She said that she took Xanax and Ultram that day but that they did not impair her ability to recall the events. She said she presently took Celexa, which was an antidepressant, Tegretol, which was a mood stabilizer, and Vesteril, which was for insomnia. She also took medications to lower her blood pressure and cholesterol. She denied telling a doctor who talked to her a couple of years ago at the prison that she was abusing alcohol and marijuana when the crime occurred.

The Petitioner testified that she thought the plea offer included an appropriate sentence but denied she had come to this conclusion based on numbers trial counsel provided in their previous discussions. She said that she had not speculated about the terms of an offer but that she wanted one in order to avoid a trial and a "media circus." She said trial counsel never told her that a life sentence involved serving fifty-one years and did not recall his reviewing lesser included offenses with her. She said that if she had any conversation with the attorney who worked with trial counsel when they went outside to smoke, she did not recall it. She said she remembered the conversation with co-counsel clearly because his anger caught her attention. She said co-counsel was the only attorney with a strong opinion. She said that she did not accept the offer because she did not want to disappoint her attorneys and that she wanted their opinions.

On redirect examination, the Petitioner testified that she wanted her conviction to be set aside and understood that she had no right to have the plea offer reinstated. She said that when co-counsel was upset, she thought she had done something wrong.

Dr. David Street testified as an expert in forensic psychiatry. He said he had reviewed the Petitioner's records, interviewed her for three hours, and listened to the post-conviction testimony. He said the Petitioner had been diagnosed with alcohol dependence, which he said did not mean she was actively using alcohol. He said the Petitioner reported she had abused alcohol in the 1980s. He said the Petitioner had a history of bipolar disorder with many more periods of depression than mania. He said the bipolar disorder diagnosis applied to the time of the offense through the trial. He said she met the criteria for marijuana abuse and possible dependence. He said that the Petitioner may have used marijuana occasionally

but that her abuse of it was well before the crime and the trial. She had a history of benzodiazepine abuse that preceded the crime and may have continued through the time of the trial. She also had a history of opiate abuse or dependence during the same time period. He thought that the Petitioner had a diagnosis of anxiety disorder but that the diagnosis was difficult to make due to the substance abuse. He said the Petitioner reported isolated incidents of using cocaine, Ecstasy, and a couple of other drugs.

Regarding the Petitioner's mood swings, Dr. Street noted her history of substance abuse issues as evidenced by her running out of medication early and obtaining prescriptions from multiple sources. He also cited her history of depression. He said that during her hospitalization for a suicide attempt, she would have been observed by several people and that her symptoms were consistent with depression and mental illness.

Dr. Street testified that a person with mental illness is more affected by stress than someone who does not have mental illness. He said the stress would be more likely to precipitate a manic or depressed episode and would be exacerbated by substance abuse. He said the Petitioner gave him a history consistent with depression leading up to the trial. He said she was isolated, not motivated, and had difficulty sleeping. He said that some of the symptoms could be from substance abuse and that it was difficult to determine how much was from substance abuse and how much was from mental illness. He said that based upon the testimony he heard at the post-conviction hearing, he thought the Petitioner was depressed at the time of the plea offer and that her judgment would not have been as good as it would have been otherwise. He said someone in a position like the Petitioner's would be subject to suggestibility and compromised judgment. He said that co-counsel's statements and emotional state would be more likely to impact the Petitioner given her mental health issues at the time. He said, though, that trial counsel's expression of no opinion would not have had an impact on the Petitioner. He said that ideally, someone should have ensured that the Petitioner understood the risks, benefits, and alternatives.

On cross-examination, Dr. Street testified that a person charged with first degree murder of his or her spouse would be stressed despite not having mental illness. He said that about two percent of the population had bipolar disorder. Regarding the Petitioner's incident after a hearing, he said the diagnosis was ataxia, or stumbling, caused by taking too much medication. He said the Petitioner reported at the time that she was having difficulty "dealing with what was going on." He acknowledged that the Petitioner was not his patient during the time leading up to the trial and that he interviewed her afterward. On redirect examination, Dr. Street testified that a person could be competent despite having mental illness.

-11-

Deputy District Attorney General Tom Thurman testified that he was present for the Petitioner's trial. He said that after the State closed its case-in-chief, a plea offer was extended as a lunch break began. He said that the State was concerned there was not enough proof to convict Mr. Rocha-Perez and that the State made the offer to the Petitioner to obtain her testimony against Mr. Rocha-Perez. He said that trial counsel asked him to step into the conference room and tell the Petitioner about the offer and answer any questions she had. He thought co-counsel was in the room when he entered. He said co-counsel was "agitated" that he was in the room. He recalled that the Petitioner looked at him and said, "Tom, couldn't you do 15," which he said was memorable because she called him by his first name. He said that he told her the offer was twenty years and that he left the room for the Petitioner to discuss it with her attorneys. He was certain that co-counsel was in the room when the Petitioner asked him about fifteen years and when he left the room. He said that if the Petitioner accepted the agreement, the State would have reopened its proof.

Deputy District Attorney General Thurman testified that trial counsel called him during the lunch break to tell him the Petitioner would accept the offer. He said he returned to talk to the Petitioner about her testimony. He said she was clear and had a good memory of the events. He said co-counsel was not present at this point. He said "they" talked to the court in chambers to inform the court of the plea agreement. He thought there was a second meeting with the court about the Petitioner's receiving a thirty-day delay to report to serve her sentence. He said that when he returned to the courtroom from the break, trial counsel followed him, was obviously irritated, and said "let's argue." He said he was somewhat surprised because everything seemed to be progressing when he talked to the Petitioner. He said co-counsel was late in returning to court. He said he did not notice the Petitioner's having any signs of mental illness that day and thought she would have been a good witness.

On cross-examination, General Thurman testified that the events transpired in an extended lunch break of one hour and fifteen minutes to one and one-half hours. He said it was clear the Petitioner accepted the offer. He did not recall her having any reservations or asking any questions. He said the only time he saw co-counsel was when he first met with the Petitioner but agreed co-counsel might have returned and talked to the Petitioner after he talked to her to prepare her to testify.

In rejecting the Petitioner's post-conviction claim that trial counsel and co-counsel were ineffective in the plea bargaining process, the trial court found that due to the passage of time as affecting counsel's memories, it could not determine the exact sequence of events during the lunch recess in which the plea offer was made and considered. The court found, though, that it was clear that trial counsel and co-counsel had different perspectives about the advisability of accepting the offer. The court found that trial counsel presented an equivocal stance and did not advocate a specific course of action, whereas co-counsel strongly

suggested that the Petitioner not accept the offer. The court credited trial counsel's testimony that he discussed the proof with the Petitioner during the discussion of the plea offer. The court credited co-counsel's testimony that he advised the Petitioner that in his view, the State's case was weak and entirely circumstantial and that co-counsel's view of the case was the basis for his recommendation regarding the offer. The court found that although there was no testimony regarding any statements of counsel relative to the elements of the offense, it would have been necessary and logical for discussion of the implications of the proof in terms of the elements of the offense to have taken place during the discussion of the State's proof. The court credited trial counsel's testimony that he reminded the Petitioner during the plea discussions that she might serve a life sentence if she rejected the plea offer. The court discredited the Petitioner's testimony that she did not know the maximum sentence she faced and found that she was well aware of the risks of rejecting the offer.

Regarding the Petitioner's claim that co-counsel's statements regarding the plea offer essentially guaranteed the Petitioner an acquittal at the trial, the trial court found that although co-counsel's statement to the Petitioner that Davidson County juries did not like to convict women of first degree murder conveyed a strong sentiment, the statement did not guarantee an acquittal. The court found that although co-counsel's advice proved incorrect, it was based upon twenty-two years of experience as a skilled criminal defense attorney and three years as an assistant district attorney. The court found co-counsel was not ineffective in this regard.

Regarding the Petitioner's claim that her attorneys failed to take her mental health issues into consideration when discussing the plea offer with her, the trial court noted the proof that the attorneys were aware of the Petitioner's mental health issues and that the attorneys used the Petitioner's mental health issues as part of the defense. The court found that although the Petitioner had been diagnosed as bipolar, had approximately one hour to decide whether to accept the offer, and was in a stressful situation that may have been compounded by her mental health issues, no credible evidence existed showed that the Petitioner was incompetent or that she did not understand the trial process or the risks and benefits of proceeding with a trial. The court found that trial counsel did not fail to consider the Petitioner's mental health issues when he discussed the plea offer with her. The court found that although co-counsel made strong statements to the Petitioner regarding the offer, these statements did not overcome the Petitioner's will and divorce her of the rational thought process she needed to understand the risks of rejecting the offer. The trial court denied relief.

On appeal, the Petitioner contends that trial counsel and co-counsel were ineffective in their actions and inactions relative to the plea offer. The State counters that the trial court properly found that the Petitioner failed to prove her claims by clear and convincing evidence

-13-

and that the trial court properly denied relief. We conclude that the trial court did not err in denying relief.

The burden in the post-conviction proceeding was on the Petitioner to prove her grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The *Strickland* standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. *State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the *Strickland* test. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." *Id.*

A defendant's Sixth Amendment right to the effective assistance of counsel includes effective assistance in the plea bargaining process. *See, e.g.*, *Lafler v. Cooper*, — U.S. —, 132 S. Ct. 1376, 1383 (2012); *Padilla v. Kentucky*, 599 U.S.356, 373 (2010). In order for a defendant to make a voluntary and intelligent decision regarding whether to accept a plea offer, counsel must advise the defendant "of the choices that are available . . . as well as the probable outcome of these choices." *Parham v.* State, 885 S.W.2d 375, 384 (Tenn. Crim. App. 1994); *see People v. Michigan*, 817 N.W.2d 640, 651 (Mich. App. 2012) (stating

"[c]ounsel's assistance during the plea-bargaining process must be sufficient to enable the defendant to make an informed and voluntary choice between trial and a guilty plea"). "If counsel is convinced that the accused should accept a plea bargain agreement and plead guilty, counsel should recommend that the accused opt for this choice." *Parham*, 885 S.W.2d at 384. This court has stated that it is "counsel's duty to recommend the plea bargain agreement if counsel [thinks] it [is] to the defendant's best interest." *State v. McLennon*, 669 S.W.2d 705, 707 (Tenn. Crim. App. 1984). Counsel is permitted to use "reasonable persuasion when making the recommendation." *Parham*, 885 S.W.2d at 384.

When a petitioner alleges that a plea offer was rejected due to the ineffective assistance of counsel,

> a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.,* that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Lafler*, 132 S. Ct. at 1385; *see also Missouri v. Frye*, 132 S. Ct. 1399 (2012).

The Tennessee Supreme Court Rules provide, "In representing a client, a lawyer shall exercise independent professional judgment and render candid advice." Tenn. R. Sup. Ct. 8, Rule 2.1. The American Bar Association Criminal Justice Standards provide:

> (a) Defense counsel should keep the accused advised of developments arising out of plea discussions conducted with the prosecutor.
>
> (b) Defense counsel should promptly communicate and explain to the accused all significant plea proposals made by the prosecutor.

Standards for Criminal Justice: Prosecution Function and Defense Function, std. 4-6.2(a), (b) (3d ed. 1993). The ABA Standards also provide:

> (a) Defense counsel should keep the defendant advised of developments arising out of plea discussions conducted with the prosecuting attorney, and should promptly communicate and explain to the defendant all plea offers made by the prosecuting attorney.

(b) To aid the defendant in reaching a decision, defense counsel, after appropriate investigation, should advise the defendant of the alternatives available and address considerations deemed important by defense counsel or the defendant in reaching a decision. Defense counsel should not recommend to a defendant acceptance of a plea unless appropriate investigation and study of the case has been completed.

*Id.* std.14-3.2.

By all accounts, the Petitioner relied heavily on trial counsel during the litigation. Counsel and co-counsel were aware of the Petitioner's reliance on them for legal advice and moral support, her lack of other support, and her mental health issues. The record shows that trial counsel thought a jury would be angry with the Petitioner due to her lifestyle choices and that its anger might affect the verdict. Counsel and the Petitioner wanted to resolve the case by plea agreement and discussed that option. Counsel worked toward that end for over a year, unsuccessfully attempting to negotiate a plea agreement on several occasions before the trial. Counsel told the prosecutor that the Petitioner would plead guilty and testify for the State against her codefendant. When the prosecutor extended the plea offer mid-trial, counsel was pleased at the prospect of settling the case and ensured the court would accept the plea. Counsel said the offer was the one they had hoped to obtain.

The trial court found that the passage of time had affected the attorneys' memories regarding the sequence of events during the lunch break and that as a result, it could not determine the correct sequence. We note the conflicting evidence regarding the Petitioner's decision to accept the offer, co-counsel's statements that she should not accept it, and her decision to reject it.

Trial counsel said that he told the Petitioner about the offer and that she was relieved and accepted it. He did not remember whether co-counsel was present when he conveyed the offer to the Petitioner but thought co-counsel left to attend the jail docket when the lunch recess began. He thought the Petitioner agreed to the offer while co-counsel was not present. He said co-counsel made his strong statements after returning from the jail docket. He said that at some point, he and the prosecutors talked to the judge about accepting a plea agreement, but he did not remember whether there were two conversations with the judge. He said co-counsel did not participate in the conference with the court because co-counsel was attending the jail docket. He also said that at some point, the prosecutors talked to the Petitioner, after which the Petitioner went outside with one of counsel's employees to smoke. He said that after the Petitioner returned from smoking, she advised him that she was not going to accept the offer.

The attorney who was trial counsel's runner and assistant during the trial testified that he came back from lunch at a different time from counsel and the Petitioner. He said that based upon what they told him, his impression was that the offer had been extended and accepted. He said that he went outside with the Petitioner while she smoked and that from their conversation, he thought she was going to accept the offer. He said he asked when she would be eligible for parole. He said that his recollection was that co-counsel's strong statements were made after they returned from the Petitioner's smoking break.

Co-counsel testified that he was present when the Petitioner was advised of the offer, that she first looked to trial counsel for advice, that trial counsel did not express an opinion about the advisability of accepting the offer, and that co-counsel expressed his opinion that she should not accept it. He said that the Petitioner relied on trial counsel for advice and that he realized he should leave to allow them time to discuss the offer. He said that he left to attend the jail docket and that when he returned, the participants were taking their places in the courtroom. He said that trial counsel told him they were proceeding to closing arguments and that he did not learn until months later that the Petitioner had, at some point during the lunch recess, agreed to accept the offer. Unlike trial counsel and the attorney who worked for trial counsel, co-counsel was confident in his recollection of the sequence of events.

The Petitioner testified that trial counsel told her about the plea offer during a break. She did not recall if co-counsel was present but thought the attorney who worked for trial counsel was present. She said she was relieved and wanted to accept the offer. She said that after the details were arranged, she went outside to smoke with the attorney who worked for counsel. She said that when she returned, one or both of the prosecutors were present, although she later said both were present. She said she questioned them about the agreement. She said co-counsel came into the room and admonished her not to talk to the prosecutors. She said co-counsel made his strong statements at this point. She said she relied on co-counsel's experience as a former prosecutor.

As we have noted, the Petitioner had the burden of proving her claims by clear and convincing evidence. The trial court could not resolve the conflicting proof regarding the sequence of events relative to the plea offer and its ultimate rejection. To the extent that the Petitioner attempted to prove that co-counsel's strong statements persuaded her to change her mind after she had already decided to accept the plea offer, she has not established by clear and convincing evidence that co-counsel provided ineffective assistance.

We note, though, that co-counsel's advice, without regard to its timing, nevertheless may have constituted ineffective assistance. Co-counsel's post-conviction testimony reflects that in addition to his strong statements, he provided the Petitioner with further explanation of his view of the case:

-17-

. . . I said something along the lines of this is a purely circumstantial case and in a circumstantial case the Judge is going to tell this jury that . . . the evidence must be so conclusive that it excludes every possibility, every reasonable except that of guilt and . . . I am confident that what I said to her was, "the doctor testified this could have been a one-person job or a two-person job and they have all admitted that there was a substantial period of time where you were gone because you had gone to the pharmacy to fill out [sic] prescriptions."

With regards to the statement about "juries don't like to convict women of first degree murder" I don't think I put gender into it, but I am confident that I said something along the lines of the hardest conviction to get is first degree murder and . . . "I don't feel like they have proven this case."

At the post-conviction hearing, co-counsel provided a further explanation of his view of the case:

I felt strongly about it then. I feel strongly about it now, that there were holes in the State's case and she should not have been convicted based on that proof. . . . I mean, that is, that is the way I feel and I feel like it is wrong for her to be doing a life sentence when it was thanks to her that Mr. Rocha-Perez didn't drive off with the victim's body in the trunk of that car to be hidden and maybe never found, but that is not really the focus of this hearing I know, but that is the way about it then and that is the way I feel about it now, anyway.

He explained the defense strategy:

Well, the way that we argued that case was there was three ways she could respond to given situations, she could say, I am going to turn Mr. Rocha-Perez in; I am going to not [sic] turn him in and I am going to [assist] him in escaping; or I am not going to decide right now.

The way that we argued the case starting from really jury selection, but for sure during opening statement was, you know, all of her actions were I am not going to decide. I am not going to decide. I am not going to decide, until he had the body ready to go and driving out and she had to make the decision and at that point she made the decision that she was going to alert authorities and she was going to bring Mr. Rocha-Perez to justice and as soon as she actually had to make a decision, she made the decision and she made the right decision and, you know, whether that was because she had some mental issue

-18-

that prohibited her from making that decision or whether or not she was just put in a pickle that would be hard for anybody to really [sic] figure out what to do, you know, she, our strategy was to say that she never made the decision to actually [sic] assist, she only made, she only delayed the decision until she finally could no longer delay any more and at that point she made the right decision.

. . . .

The record speaks for itself [regarding the Petitioner's mental health issues], and the record also speaks for the fact that she was prescribed with a number of medications that had mental health implications and . . . when I was on my feet arguing it was not to the jury [sic] to give her a break because she has got mental health issues. It was Ms. Freeman never, while there were bad facts here, all of those bad facts really just pointed to delay instead of a decision to assist.

Co-counsel testified that when he and trial counsel eventually discussed the case months after the verdict, they were disappointed and thought the jury "had been so biased by the outrageousness of the facts that we discussed that maybe they never even really considered our position that we had so carefully worked to try to be able to present."

Regarding co-counsel's advice, the trial court found:

The Court finds that [co-counsel] informed the Petitioner that, in his opinion based upon the proof presented at the trial, that he would not allow his own daughter to plead guilty in the case. The Court notes that [co-counsel] does not remember the specific contents of the second statement, but through the testimony of [trial counsel and the attorney employed by trial counsel], both of whom were in the room when [co-counsel] made the second statement, it is clear to the Court that [co-counsel] stated to the Petitioner that Davidson County juries are typically reluctant to convict women of First Degree Murder. The Court finds that while these statements conveyed a strong sentiment to the Petitioner that accepting the offer would be imprudent, that the statements were not a guarantee of an acquittal with the Petitioner's denial of the pending offer. The Court finds that these statements imparted to the Petitioner the clear advice from Mr. Funk of his professional opinion regarding the proof presented at trial. The Court notes that, in hindsight, as things worked out, [co-counsel's] advice was obviously mistaken; however, [co-counsel's] advice was his professional opinion steeped in his, approximately, twenty-two (22)

-19-

years of experience as a skilled criminal defense attorney and three (3) years of experience as an assistant district attorney. In attempting to eliminate the distorting effects of hindsight, the Court finds that [co-counsel's] statements were certainly bold assertions, but this Court is not prepared to find that these statements, under the circumstances of the trial and the pending offer, rise to the level of ineffectiveness.

As the trial court noted, co-counsel's advice regarding whether the Petitioner would have been better served by accepting the plea offer proved incorrect. Hindsight, however, is not the appropriate means for reviewing an attorney's actions relative to an ineffective assistance of counsel claim. *See Howell v. State*, 185 S.W.3d 319, 327 (Tenn. 2009) ("In reviewing counsel's conduct, we must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time.") (citing *Strickland*, 466 U.S. at 689). We conclude that the evidence does not preponderate against the trial court's finding that co-counsel's advice to the Petitioner about accepting the plea offer was not ineffective.

We turn to trial counsel's failure to make a recommendation to the Petitioner regarding the plea offer. Counsel had attempted to obtain a plea offer for more than a year and believed the State's twenty-year offer was beneficial to the Petitioner. The attorney who practiced with trial counsel testified that the Petitioner repeatedly expressed her desire for a plea offer and that he thought a good offer would have been twenty years.

Co-counsel stated that counsel advised the Petitioner of the offer within a minute of receiving it and that the Petitioner immediately asked counsel his opinion. Counsel said he told her that he could not tell her what she should do. Co-counsel, though, said counsel threw his hands in the air as if to signify, "it is your call, not mine." Although the ultimate decision to accept or reject a plea offer remained with the Petitioner, counsel had a duty to tell the Petitioner that he believed accepting the offer was in her best interest. *See McLennon*, 669 S.W.2d at 707.

We conclude that trial counsel was deficient by failing to offer his professional opinion regarding the plea offer when it was extended. The Petitioner became close to counsel during the course of his representation, and counsel knew of her history of bipolar disorder, depression, and anxiety and knew she had no family support system. She relied heavily on counsel's advice. The Petitioner faced a life sentence if convicted of first degree murder at the trial, but the plea offer permitted release eligibility after serving thirty percent of a twenty-year sentence.

The question becomes whether the Petitioner was prejudiced by the deficient performance. The record reflects that throughout the litigation, the Petitioner wanted a plea offer and that trial counsel thought a plea agreement was the better disposition of the case. The offer received was the one the Petitioner had wanted and toward which counsel had been working for over a year. The record reflects that the Petitioner had multiple mental health concerns, and relied heavily on trial counsel, speaking with him at length before the trial. It likewise reflects, though, that despite counsel's failure to make a recommendation that she accept the plea offer when it was extended, the events occurred in about forty-five minutes in the midst of the trial. The trial court credited counsel's testimony that he reminded the Petitioner during the course of the plea discussions that she might serve a life sentence if she rejected the offer and that he discussed the proof with her during the plea discussions. The court discredited the Petitioner's testimony that she did not know the maximum sentence and found that she knew the risks of rejecting the offer. Although the record does not reflect that counsel specifically recommended the Petitioner accept the offer, the Petitioner and counsel had discussed a plea agreement many times and wanted the offer that was ultimately received. The Petitioner failed to establish by clear and convincing evidence that she was prejudiced by any deficient performance of counsel in failing to make a recommendation at the time the offer was received.

We have not overlooked the effect of the conflicting advice the Petitioner received from trial counsel and co-counsel. The record reflects that the Petitioner relied primarily on counsel and had the benefit of extensive discussions with him about the advisability of a plea offer, the terms of a favorable plea offer, the proof, and the possible sentence she faced if convicted. Counsel and co-counsel had different views of the proof, and they fully and candidly advised her of their views before and during the trial, and to some extent, during the forty-five minutes the plea offer was on the table. Counsel took steps to ensure that the court would accept a guilty plea at the late stage in the proceedings and made arrangements for a delayed reporting date. Knowing that the proof that had been admitted against her was inculpatory and included evidence about her lifestyle and drug use, that she faced a life sentence if convicted of the first degree murder of her husband, and that she could avoid the life sentence by pleading guilty and testifying against her co-defendant, the Petitioner nevertheless chose to accept the risk of rejecting the offer and pursuing the trial to its conclusion. The Petitioner was offered conflicting views of her case from two experienced and prepared attorneys. She made a considered decision, although it resulted in her being convicted of first degree murder and receiving a life sentence. She has not established by clear and convincing proof that she was prejudiced by the conflicting advice she received. Both views were based upon the evidence, defense strategy, and the attorneys' experience. She is not entitled to relief.

-21-

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE